May it please the Court, my name is Scott Sugarman. I'm counsel for Kevin Laney. Mr. Bellis, who represents Mr. Federico, is present. We're going to split the time ten minutes between each of us, with your permission, and I'll reserve two minutes of my ten for rebuttal, please. Okay? Very good. The government in this case charged Kevin Laney with quite serious Federal crimes that resulted in his conviction, and he's now in prison. But he had no right he had no jury trial. For the government's argument to prevail, that there was a valid waiver, this Court has to ignore the plain language of Rule 23 and 30 years of jurisprudence in this circuit. Rule 23 itself says there must be a jury trial unless the defendant waives a jury trial in writing, close quote. It doesn't say the parties, it doesn't say the lawyer, it says the defendant. That's the language. This Court has never held, and to my knowledge, no other. Were you the trial attorney? I was not, sir. Can you explain to me why we don't have an invited error problem here? As I read the attendance at the status conferences where the subject of the waiver came up, and that there was a pending Bruton problem that would have attended a jury trial, and it looked to me like defense counsel did not want severance and two separate trials. They wanted to try the case together, and for that reason, they stipulated to a trial to the bench, thereby eliminating the Bruton problem. There's no suggestion in the record that either client didn't authorize his counsel to waive on his behalf. So the case really comes down to the argument that you're making, that there isn't a written waiver or some sort of an oral colloquy on the record in the courtroom between the judge and your clients to confirm the waiver. But because of the defense tactic of requesting a bench trial, why should we not invoke the doctrine of invited error? Respectfully, I disagree both with your assumption and your conclusion. Okay. In fact, the government commonly wants a single trial. It's much easier for them. They want it to happen. But there's no evidence on the record which of the two sides, the government or defense counsel, wanted a joint trial if either did. There may well have been some kind of combination of reasons. One of the things — Well, had the Bruton problem remained because of the fact that the defendants were facing jury trials, the district court would have to have had to sever the two co-defendants, would they not? If the government wants to use the statement or certain parts of the statement. Again, that wasn't part of the conversation on the record, so we don't know. So I think it's probably some, with due respect, speculation to say it was the defense moving for a joint trial. We do know with regard — I can't remember whether it was Laney or Federico — there was some sort of a post-trial declaration where the defendant did acknowledge that he authorized his counsel to waive. And, in fact, that becomes important. It was Mr. Federico, not Mr. Laney. Right. And there's nothing on the record with regard to Laney. Correct. But what's interesting is Judge Gonzales-Rogers denies the request even to get the merits of that because it's a second motion for a new trial. She said, I'm not going to go there. But interestingly enough, inferentially, I must concede, she rejects the government's argument that, of course, the defendants were at the conference and must have agreed because, in fact, she makes no such reference. In her order, she could have said, but Mr. Federico was there. He told me it was fine. Having not done so, it certainly raises the very strong inference that they were not present. To go to your conclusion, to the contrary, there are certainly many cases where a defendant's silence in the trial court will waive an issue or, as you say, be invited error. With certain core constitutional rights, that's never the case, which is why Rule 23 says the court must take a waiver in writing. This Court has said at a minimum – this is the Court's language – there must at least be an oral, on-the-record inquiry of the defendant. There really are two reasons for that. We have a writing, but your position is it doesn't contain a written signature from the client, that the defense counsel cannot bind the client to satisfy Rule 23. That's certainly this Court's prior rulings. I've cited half a dozen cases, including Guerrero-Peralta, which is cited in the briefs, and Gonzales-Flores, where, in fact, a lawyer did say it was okay and the client did not. That's the Guerrero-Peralta case. And this Court said that won't do. So the difficulty here is we never know what the lawyer tells the client. So let me give you a different scenario than the one you suggested. The lawyer has been paid money up front. He says, a jury trial? It'll take me four weeks, and I'm not very good in Federal court. I want someone next to me. If I waive jury, I get a two-week trial, I'm adequately paid, and I have a co-counsel to help me. There may be lots of reasons, but that doesn't matter. We don't know what that lawyer told the client for the purpose of a knowing and intelligent waiver. And I think that becomes the critical point. What standard do we use to review here? I mean, is this error? Is this plain error? Obviously, this was not brought to the attention of the district judge while the trial was going on. I think the question is just one of error, Your Honor. The government concedes this is structural error if the Court finds error and, therefore, requires reversal. And the question is, this Court reviews de novo, this Court has previously said, so it looks at the question of was there a valid waiver. That's what this So it's a de novo review to determine was there a valid waiver. And if you look at both Rule 23, which is quite explicit, and this Court's decisions on that issue, it says there was no waiver at all. The closest case I can – I've been able to find is the SADYA, if I'm pronouncing it correct, S-double-A-D-Y-A.  1985, which said that where there's no in-court oral waiver or a written waiver, they've been denied the right – if an eventual trial occurs, there's been a jury trial denial. I agree with you. But that case sort of leaves the door open a little bit, doesn't it? Doesn't it talk about or other form of waiver? Not to my knowledge, Your Honor. In fact, the Court subsequently – or, excuse me, at about the same time in Guerrero Peralta said, at a minimum, there must be an on-the-record oral admonition by the court as to rights and waiver or the written waiver required by Rule 23. I'm aware of no decision by this circuit or any other circuit that has found a lawyer saying, it's enough, Your Honor, we say it's enough, we're going to waive jury, and no questioning of the client. None in anywhere in the country that I know of, and the government cited none. You would think they would. And the arguments they made were actually rejected in the case you just referred to, Sayyadar, if I'm mispronouncing it as well, and similarly were rejected later by Shorty by this Court. So I think, frankly, it's reviewed de novo. If there was not a valid waiver, it's structural error, new trial is ordered. Let me just take one moment on one other issue, with your permission, which is the constructive amendment variance issue, because I think it's really quite dramatically clear. In the indictment, I'm going to read one sentence. This is the core of the charge, that they submitted fraudulent invoices for material used and work performed by the businesses knowing that the materials were not used and the work had not been performed. That's the indictment. They give you, therefore, a structure for what, in fact, how the fraud happened. And I think it's undeniable that both the government and its briefs to this Court talk excessively about conflicts of interest and how there was release of confidential information. It's an entirely different theory. Well, I'm not sure that it is. I mean, as I understood the purpose of creating the sham companies that each of the conspirators billed Imperial, there's no evidence in the record that any actual engineering work was done. So it's clear that the invoices that were and that the same people who were behind those charades were in a position at Matrix to influence the award of bids to Imperial. So why isn't that part and parcel of the scheme to defraud? The trial court found, not unreasonably in some sense, that certainly Matrix had to be involved. But your assumption about invoices is mistaken in the record. No invoice from any of these companies ever went to Matrix. But that's not the point. I mean, the point of the sham invoices, as I understand it, was simply so that the money could be paid. In essence, the kickback could be funneled to the conspirators by, quote-unquote, paying these invoices. And that money, in essence, was included in the amount of money that Matrix was billed by Imperial. That's how the money flowed back to the co-conspirators. So I really don't understand your variance argument. Because in fact, the indictment says that Matrix was billed for work that was not done or materials not provided. That's the indictment. But isn't, if that work is, quote-unquote, work, is included in the amount that Matrix was asked to pay, why isn't that part and parcel of the scheme to defraud? Because I'm not saying you could have, in fact, defined a broader scheme to defraud. They told the defense, here's what we're claiming. You didn't do work that you billed Matrix for. That's not true. Imperial did every ounce of work that they were hired to do. But you're eliding the question of what was the value of the work that was done by Matrix. For example, the McKittrick tank project for $90,000 for two tanks or whatever it was, was inflated so that there would be money available to pay these invoices. I understand the government's theory, which you've articulated just now. But that was the proof at trial. I read the indictment and it appears to me that the language is broad enough to include this as part and parcel of the scheme and artifice to defraud under 1341. I think not, because what the government presented at trial was that the argument they made was that the project manager at Matrix gave confidential information to Mr. Federico. He allowed, that allowed Imperial to provide a higher bid. Imperial did exactly what it said it would do, say fix those two tanks. It did it. There is no evidence in the record that anything less was provided or the materials weren't provided. They were paid exactly what they bid. So they had no inflated invoices. So when it talks about inflated... But again, you're overlooking the fact that the decision makers at Matrix who influenced the awarding of the bid got a kickback, a portion of that money for the tank project by paying through Imperial, the invoices that were submitted for work that was never done. Your Honor, not, their conduct, as found in this report, was not acceptable. I'm not arguing the client said, well, but what I'm saying is... No, we understand all the conflicts of interest. But when the government makes a choice of its indictment and hands it out, it says to the defendant, this is what you're going to be tried against. Well, let me come at the question in a different way. How was the defense prejudiced by the alleged variance? Easy. The defense core argument was we never submitted an inflated or false invoice to Matrix ever, and the government, in fact, found none by Mr. Laney ever. So they said, you are not proving we billed for work we didn't do to Matrix or billed for work for materials we didn't provide. But I just don't understand how that matters in terms... In other words, you can be convicted of mail fraud because you set in motion a scheme of conduct that ultimately results in money being deposited or an invoice being mailed. And there's no requirement in this case or any other that there actually had to have been work done behind these false invoices that benefited Matrix. The whole scheme, as I understand it from the indictment, was to figure out a way to channel the kickback money back to the people at Matrix who were influencing the awarding of the contract. I agree with you. If the government had charged in the language of the statute, you've defrauded someone. Name the victim. Then they have a wide range of what they can prove. But the Fifth Amendment set is determined by this Court's decision and the U.S. Supreme Court's decision says, if you pick a method by which the fraud occurred, that's what you must prove unless you get a new indictment. That's why I respectfully suggest you look at Adamson again or Davis, this Court's decision from February of this year, in which the slightest change was made on how they were going to prove one element. And this Court said, constructive amendment must be reversed, because I'm not saying that anyone would like the conduct. The defense focus had been on, we, in fact, were defrauding Imperial. Now, the trial judge said, I don't believe that. But that was their defense. And it was a direct response to the indictment that said, you submitted inflated bids, excuse me, invoices, for work not done to Matrix. I thought the defense theory was not defrauding Imperial so much as getting money to Mr. Federico that was owed to him by Mr. Ibarra. Right. They say there was no fraud on Matrix because they never submitted an inflated invoice for work not done to Matrix. You keep saying that they never submitted, but that money was included in inflating the bill that Imperial sent to Matrix. Let's assume that's correct. And if they had charged the crime in that way, that is just in the language of the statute, the government may have been able to argue that. But they chose not to do it. They chose to allege, this is how you did the crime. It's like saying, I'm charged with assaulting Ms. X. And they tell me when it happened and where it happened. And then they prove that I assaulted Ms. Y. I would say, no, no, this is the notice I got. I was going after Ms. X. You cannot prove in this trial I assaulted Ms. Y. Well, I mean, let's look at the indictment. I'm looking at page 2 of the indictment, ER 63, paragraph 7, where it accuses the four co-conspirators of submitting false invoices in the names of legitimate existing businesses and in the names of businesses created especially for the purpose of perpetuating the fraud on Matrix. And I'm suggesting that if the fraud was to increase the value of the bid to Matrix, which the co-defendants were in a position to allocate or approve, then Matrix was, in fact, defrauded. It paid more for the work than it should have legitimately paid. But for this, I'll call it, extra cushion that was included in the bill that Imperial submitted to Matrix so that the kickbacks could be funneled back to the co-conspirators. May I direct you to the very next paragraph you referred to? Sure. This is paragraph 8, said, pass the inflated false invoices on to Matrix. So they're saying, and they do it again if you go to the actual count 1, it talks about the same thing, and that was, in fact, the government's theory, that inflated invoices were passed on to Matrix. The evidence was absolutely clear that never happened. Maybe we're just quarreling over the choice of words in the drafting of the indictment, but go on to the next sentence. Matrix paid the invoices submitted by Imperial. It did. And they were for work done. And those invoices included the inflated false invoices that had been submitted to Imperial, which then got passed on to Matrix. I'm just not seeing the variance here. That's not what the government charged with due respect. That's how I'm reading the language of the indictment. Right. And you certainly could have taken what you've just said, put it in words of indictment, and then they could have proved that. But it's in the indictment. I mean, what am I missing here? Are we just arguing semantics? I don't think we're arguing semantics. Actually, I think we're arguing Fifth Amendment jurisprudence of notice and fairness in trial. But I'm still trying to figure out how the defense was harmed, knowing that this was the theory. I don't want to eat up my time, Mr. Belson, responding to your questions. I'm sorry if I've done a poor job of trying to answer them. No, no, no. No, you've done your best.  Thanks. Thank you. I'd like peace between co-counselors. I was getting ready to. OK. It happens all the time. Thank you. Thank you. All right. I'm going to try and split mine in 10. I can see you getting nervous as you sat there. Yeah, well, no kidding. I was looking at that clock around the corner. OK. No, you've got your 10 minutes. Go. Thank you, Ben. Thank you. Addressing the invited error issue, that is an interesting issue. Because Federico actually does say it's OK to go ahead and waive the jury, and this counsel signs off. But I don't think that solves it. And I think Mr. Sugarman touched a little bit on it. And that is, the invited error, you have such a fundamental right under the Constitution, as well as the statute. And he's not voideered on it. There's no evidence that when he is voideered on the details of what it means to waive a jury. It sounds good to him. Oh, we'll be together, you know, all that. But unless you have that extra piece of the puzzle, which is not here, then you can't really pin the invited error on him. He's got that right to know that his lawyer had a colloquy with him. And in the case, I guess the Sedea case, he said, if you don't get the written waiver, you've got to actually ask the questions about, you know, it's 12 people beyond a reasonable doubt. One person doesn't vote guilty. You're going to be OK. You don't get convicted. Those are just foreign concepts to a person going through a trial. And so I don't think the invited, you know, I saw it. But I don't think it's fatal to us, OK? If Laney and Federico, your joint clients, had been present at the pretrial conference, and when the lawyer said, we've reached an agreement to have a bench trial, and we'll forward a stipulation, and they had both said, we agree, would that have been enough? No, it really wouldn't have been. The judge would have then had to ask questions, what are you agreeing to? Do you know what you're agreeing to? Do you know a voluntary waiver of a jury trial? We go through this every day in the criminal courts. I understand that. Is there case law that requires Miranda-warning-like precision with respect to an acknowledgment of a waiver of jury trial? I wouldn't call it Miranda. Fundamentally, Boyk and Tall and the state courts and what have you, fundamentally, you must be advised in detail as to what it means when you're giving up your rights. Yeah, thanks. So I think that has to happen. And I think that's what this is. But if they had signed a written waiver and not said a word, that would be OK? Well, that's under the statute. Frankly, it doesn't do much for me, but it's what the federal rule says. Well, under Sanja and these other cases, it clearly would be OK, wouldn't it? If they personally signed it, not if they authorized their attorney. Yeah, they wouldn't have to say a word, just sign their John Henry. That's correct. That'd be enough. That's correct. So in your client's case, Federico, who later acknowledged that this stipulation was fine by him, that's not enough? Wasn't signed by him. It was signed by his attorney. No, but didn't he later acknowledge that that was OK? He later acknowledged it was OK that his attorney waived the jury trial and signed. Yes, that's true. But there's no evidence. And more than that, he asserts that he authorized. He authorized it, that's right. But does he know what he's authorizing? Are we confident that he knows what he's authorizing when he's giving up a jury trial? First of all, this is Judge Hawkins' point. We don't have any particular knowledge when he signs his name, because all we know is that there's a signature. Well, I don't like that rule myself. I think it should be the United States Constitution. We have to have a complete void here. There are rules I don't like. I think that rule is inadequate, but, again, that's the rule. But that wasn't complied with here. And so, therefore, you've got to go to Plan B. Plan B is a traditional way. You've got to ask the man all these things about, do you understand? Okay. That's what I think in dealing with that. The other issue, the inflated bid. I don't believe. Let's go to the McKittrick thing. The McKittrick thing, the tanks down there near Taft, near Bakersfield, in a remote location, the $45,000 bid, that was there before Federico comes on the scene. That was apparently for one tank, to clean up a tank or whatever the vague order was. Federico goes down there. His shop is in Livermore. He says, I can't bring my whole equipment down here. I want two. I want to do, or maybe I'm not going to do it for one. So there's nothing about that bid being inflated. There's nothing that ties that bid even directly to Laney. Well, I understand your argument. Your argument was that the government never proved what the fair market value of the work was on repairing the two tanks. But it seems to me that the answer to that has to be, if Imperial couldn't do the work of repairing the two tanks for $90,000, then there wasn't any extra money in the deal that could be kicked back to the folks at Matrix, the co-conspirators who had approved the work to be done. So I don't think the government has to prove fair market value in this instance, because otherwise there's no explanation for why that money got paid. I don't think the government has to prove, or anyone has to prove fair market value. The value that the subcontractor bids, that can be anything. That can be what the market bears. But didn't Mr. Ibarria, is that the co-owner? Yeah, I mean, didn't he testify that business got really good after he and Mr. Federico got together? And the oil industry, gas prices were high, and the oil industry was going great guns. And when it rains, we all get wet, and everybody was getting soaked here in cash. He also conceded he didn't know how to bid. He was inept at that. He said, it wasn't my thing. So I got a guy, sort of a PR man in here who could- But inherent in that testimony is that Imperial wasn't losing money on this work. And there was, what, $1.3 million that got, I'll call it, sculpted out of the invoices that Matrix paid? But we're right where the rubber meets the road on this, because Matrix pays $1.3, we'll say. Or they pay $70,000 in that particular McKittrick case back to- Well, they paid more than $1.3, didn't they? Let's just assume that the $70,000 on the side to Plains, the owner of that tank in Southern California, they pay it. But they don't pay it necessarily because they lost that money. They pay it for publicity or for PR reasons, I should say. They're a big company. They don't want — if that thing smells of kickback, they're just going to get that — send that money back. There's no proof. They didn't lose that money. That $90,000 might have been a perfectly fair bid or a perfectly legitimate bid. Fair is not the right word. The subcontractor — I think you'd have a much stronger argument if there were only one construction project here. But — Oh, I agree. But the district court had ample evidence that this was done repeatedly in contract after contract that Matrix did for Chevron and, what is it, PAA, the tank farm owner. Yeah, I agree. I agree. And I'm only addressing now count two, which is, in fact, the McKittrick contract. That should be reversed. It should not have stood. That was different. What we've got is that we've got a conspiracy that includes count two as one of the substantive overt acts in furtherance of the conspiracy. And the district court could consider, in determining whether the evidence was sufficient to convict under count two, the conduct of all of the co-conspirators. I agree. And so she could look at what they did in all these other cases and conclude that they did it at McKittrick as well. It's an erroneous conclusion. This doesn't fly here. That bid wasn't — I'm having a hard time understanding the Virginia versus Jackson, why that's — or Jackson versus Virginia, why that test is not met. Well, because the actual bid's not inflated. It is what it is. Okay. And then again, the money that's kicked back has to do with the fact that Federico resents the fact that your borrower is ripping him off all the time. So does their — apples and oranges, they're not tied together like the court seems to be looking at it or the district court looked at. In that particular case, they're not. But isn't that the province of the finder of fact in order to make the inferential leap from this evidence? It's not a fair inferential leap. And that's — I'm going to reserve what I've got left here. I've got a couple of minutes. Thanks. Let's hear from the government. Good morning. May it please the Court. I'm Doug Wilson on behalf of the United States. And were you the trial attorney? No, I was not, Your Honor. Anybody here was a trial attorney? No, the trial attorneys have — for the government have both left the United States, so. The trial attorneys for the defendants, they are somewhere else, too? They've left the jurisdiction. Well, one's a Contra Costa County judge and the other's in private practice, so. So whether this is — whether we have plain error or invited error, in our view, the defendants have asked for this particular result. They have waived the jury trial or they're not entitled to it. It might make a difference to me, though. Do you consider this to be plain error, invited error, de novo? I mean, what's the review standard that we use? Well, it's certainly not de novo. It's either plain error or invited error. We did not make an invited error argument in our brief. Judge Tolman is — this morning was the first to bring that up. And that — Do we apply plain error review to cases where structural error is argued? Yes, Your Honor. The case from — that is not cited in my brief, United States v. Racio, 371 F. 3rd, 1093, where the Court said that structural error absolves the defendant of showing the third prong, that is, the prejudice prong of plain error. So the defendant must still show that there was error, that it was plain, and that it seriously affected the integrity of public proceedings. So in our view, the defendants have not shown that there was error, that it was plain, and that it has affected the public proceedings. Do you contend there's no error whatsoever? We contend that there's no error whatsoever, because this — So how was Rule 23 complied with in your view? It was complied with by the defendant's counsel signing a waiver of the right to a jury trial. So you read the rule as saying that the defendant himself or herself need not sign? The defendant — yes, Your Honor. The Court has been extremely clear that the defendant himself or herself need not sign a waiver. What's your best Ninth Circuit case on that? There's no Ninth Circuit case that actually — But I think that Fifth Circuit's decision in Page is helpful in that it basically says that when the defendants have asked for something, they're not entitled to argue that it's an error. And in this case, the defendants could have had a jury trial. The Court had set two individual jury trials because of the Bruton problem. It then, at the defendant's request, apparently, it joined the trials for a single bench trial. And we know that, for example, from the declaration that Federico filed after the trial, that he was agreeable to this. Laney has not shown that he was not agreeable to it, the — in particular, that Laney has not shown that he was not present during the March 18th telephone conference that the Court held. And until he shows that, or until there is some showing of that, he cannot show that he was not aware of the — that a — that the Court was thinking of waiving the jury trial. An Article III district judge on one end of the telephone conversation and three lawyers, two defense lawyers, and an assistant United States attorney, and no one has the presence of mind to say that the defendants are either, A, present, B, not present, or C, have consented to not being present? And that's OK? Well, they — the defendants consented. There was a discussion, I believe, of the defendants not being present. They waived their presence at the — at the pretrial conference. There's a discussion on the record that the defendants have waived their presence, but you're arguing it's their burden to show that they were not there? It's our burden — it's their burden to show that that plain error occurred, and they have not shown that. They have shown that they waived their presence for the pretrial telephone conference. And — I'm sorry. They have not shown that — let me back up. They have — they — they waived their presence for the pretrial telephone conference, and — and that's clear from the record. Can I come back to the question of signing and who must sign? You said the law is very clear, that only the lawyer needs to sign. Judge Hawkins says, what's your Ninth Circuit case for that? And you said you had none. What cases do you have? Well, Your Honor, I'm not saying that the law is clear. I'm saying that the Ninth Circuit — I'm saying that the Ninth Circuit has taken a flexible approach to Rule 23. Sometimes it has said that a colloquy is enough. Sometimes it has said a signature is enough. It has never specifically said that a signature by a lawyer is not enough, is not sufficient. Has it ever said that in the absence of both, it's okay to go to — to have a waiver of a jury trial? Perhaps I'm misunderstanding the Court's question, but it has said in the absence of both. It — it said — it has said that there has to be a colloquy or there has to be a signature creates a presumption that — a signature by the defendant creates a presumption that the defendant has — has waived his right of — to a jury trial. And our — our submission is that the signature under these circumstances, the signature of the defendant — I'm sorry, of the defendant's counsel is sufficient to constitute a waiver under Rule 23. How do you deal with Sondja? Sondja. Sondja — well, it does not specifically say that — that — well, I'm sorry. It does specifically say that — that — oh, I should — I should have — What it says is if there's, A, no written agreement signed personally by the defendant, or, B, an in-court colloquy with the defendant, there's no jury trial waiver. That's what it says. It does say that, Your Honor. But our submission would be that there was a waiver by the defendant's counsel in this case, and on the circumstances that — that we have here, there was no error. That is, the defendant's — we — we have a — a post-trial declaration from Federico saying he — he knew about it, and Laney has not established that he did not know about the waiver. In addition, the waiver was in their favor. They — they did not want a jury trial, separate jury trials, because they — that would not allow them to have a joint defense, and it would not allow them to present their defense to the jury. In the record, does it say that? I'm sorry, Your Honor? In the record, does it — does either Laney or Federico, or both of them, say, we wanted a bench trial because we thought it helped us? I'm talking about the defendants, not their lawyer. It — the — Federico does not say it helped us, but he does say he was agreeable to a — a bench trial in the declaration, which somehow didn't make it into the excerpts of record, but it's — it's part of his filing at 197. It was the untimely motion for a new trial — in support of the untimely motion for a new trial that he filed. You've got to hope that this case is on the bulletin board at your office about why an assistant U.S. attorney should demand a written waiver from the defendants personally. I — I agree, Your Honor. The — the — either the district court or the defense — or the — the assistant United States attorney should have demanded a — a trial, but I don't think the government should be penalized, and nor should the district court, for — for what — for something that the defendants essentially wanted in this case. And in a — No penalty to the district court if we reverse on that basis. She never sees the case again. So there's no penalty to her. Well, I'm not aware that she would be — well, if the court wishes to — to reassign it, it can, but I don't believe that — that a waiver of a jury trial would — would be seeking again. In other words, it's just a waiver. So the court could hold a — a proceedings on remand. I don't believe there's a double jeopardy bar to — to any further proceedings. I notice that the court's looking at me so skeptically. Well, the only double jeopardy bar would be if we found that the evidence was insufficient. That's correct. And — and also, as to counts four and five, the district court acquitted Mr. Federico, and we could not retry those. Right. So — but — But even if we find structural error, that — that — that would not trigger double jeopardy, preventing retrial on the counts of conviction. I believe that's correct, that the court could find that there had been an insufficient waiver of a jury trial and then remand to the district court for additional proceedings, whatever those proceedings might be, whether guilty pleas or another trial in front of a jury. Or the defendants may waive a jury trial again, because the Bruton problem still exists and would not go away, and the defendants may not want a jury trial. What was the nature of the Bruton problem? Laney gave a statement, I believe, to — to the FBI, and I'm not completely — It's a we did this kind of thing? I believe so, Your Honor. But the statement was made to a law enforcement agent. The statement was made to a law enforcement agent. There is — Under our law, you could redact. You could instruct the agent to say, I, instead of we, correct? Well, apparently — and I haven't gone into this, but — and it's not being raised on appeal, but apparently that was not possible in this case, and the — and the government conceded that a — that there would have to be two separate jury trials. It then found cases from this court that say that a bench trial does not raise a Bruton problem, and the court cited that in the stipulation that it signed. At the time of the telephonic hearing where the party said they had reached an agreement to have a bench trial, had the court affirmatively stated we have a Bruton problem and absent some adjustment or et cetera, it looks like we'll have separate trials? I don't — the court had set separate trials. I don't know whether the court had actually said we have a Bruton problem. But they had set separate — But they — the court had set separate trials, separate jury trials. And then there were two telephonic hearings. One, Laney agreed to a bench trial, and then Laney — then Federico joined him. So Laney and Federico both ended up with a bench trial before a — And when you say Laney and Federico, you mean their attorneys? Well, yes, Your Honor. I mean, their attorneys signed that. As I said before, we don't know — we know that Federico was, quote-unquote, agreeable to a bench trial, and we don't know anything about whether the district court quizzed Laney about it. I just want to point out that there are other rules that specifically require the defendant's attorney and himself to waive a right. In particular, Rule 10 specifically says the defendant in open court, after being advised of the nature of the charge and the defendant's right, waives prosecution by — I'm sorry. A waiver has to be signed by both the defendant and defense counsel. So by not saying that the defendant himself has to sign the waiver of the jury trial, the drafters of the rule, at least by implication, did not mean to include the defendant himself in that — and require the defendant to execute a waiver. But the First Circuit in the Laney case has said just that, right? I'm sorry, Your Honor. The United States v. Lina, First Circuit, haven't they said it's got to be a signature? I — L-E-N-A or L-A-J-A? L-E-N-A, 448 F. 3rd. 86. I didn't look at that case before I came in this morning, but — That's fair. I — this Court has taken a more flexible approach. And I think — I think that to the extent that other courts have required a signature from the defendant, that's not the law in this circuit. Yet. Might be about to be the law in this circuit. Well, that would be a fairly major change. I mean, this Court has basically taken a flexible approach, and a number of different judges have signed on to that flexible approach. And I don't think that this is the case where a court should impose a requirement that the defendant himself sign a Rule 23 waiver, because there are circumstances — the circumstances vary. And this may not be the case. This Court may find that the defendant did not execute a Rule 23 waiver. But this is not the case, I don't think. But the language of the rule says the defendant waives a jury trial in writing. That's correct, Your Honor. Kind of sounds like the defendant is supposed to do it. Well, except that the rules themselves use the defendant basically as a default. And so when the — when the rules are mean to say that the defendant has to do something personally, the rules say that. And for example, Rule 11 says the defendant has to be addressed personally, and it uses the word personally. As I said before, Rule 10 says the defendant and his — and defense counsel have to sign a waiver. So Rule 7b says the defendant in open court has to — has to waive the right to indictment. So there are — there are situations where it's clear from the rules that the defendant himself has to sign a waiver, and this is not one of those situations. There are — there are many situations where the rules impose a requirement on the defendant, and by that — by the defendant, I think the court — the rule — the person who stands, you know, the defendant or his counsel. I'd briefly — well, if the Court has no further questions on the jury trial, I'm — I'm — so I'd briefly like to address the constructive amendment. The — the indictment says, in paragraph 6, says that the defendant's defrauded matrix by knowingly submitting or causing to be submitted false and inflated invoices to matrix. In our view, the causing to be submitted is sufficient to cover what we actually proved at trial. The — the defendants submitted the false — what happened in this case is Imperial submitted false bids to — and inflated bids to matrix, and then the defendants, most of the — several of the defendants submitted invoices to Imperial, and Imperial — matrix paid Imperial, and Imperial paid matrix. But we think that the cause to be submitted is sufficient to — to obviate any need to — to — or any — any — any constructive amendment argument, that it shows that the defendants did — that that is what the government proved, that the defendants did submit inflated invoices to the — to — to matrix through Imperial, and that was sufficient to — to avoid any constructive amendment. If the Court has no further questions, I'm happy to submit the case. Thank you. Thank you. Thank you. Now, there was a vain attempt by Mr. Sugarman to save two minutes. Why don't we put two minutes on the clock? But I suspect we're going to be rather strict with the two minutes. I will take that generosity and not abuse it. Let me respond to several specific questions you asked the government. First, with regard to Rule 23, the government suggests that the word defendant, which you've pointed out is in Rule 23, is somehow flexible. In fact, the contrary is true. In the rule itself, it in other places uses the word the parties. So it chose the word defendant quite pointedly, and to read it out of the rules when, in fact, in Rule 23 in several places, it says the parties may agree to something. This Court also has said even the parties must require a defendant participating. The Court asked about the standard of review. In Shorty, this Court said it's review de novo, the jury trial issue. So if the Court looks at United States v. Shorty, that's what it, in fact, holds. You asked at the beginning of his argument what requirement, what a court must ask of a defendant before he waives his jury trial right. This Court has already specified that in United States v. Gonzales-Flores, which is at page 2 of my reply brief, and it says the court must, and it specifies, 12 jurors, unanimous jury, you can participate in voir dire, and if you give up your jury trial, I alone get to do it. So this Court has already specified what should be advised so the Court can decide if there's a knowing, intelligent waiver. Because the bottom line is defendant may say, yes, I want to give it up, but not understand it. And this Court would readily say if there was not a knowing, intelligent waiver, there's not a valid waiver, which is why the review is done de novo by this Court, because it's a legal, constitutional question. So the last point that I would make, in my 30 seconds, is that the government argues the Ninth Circuit has taken a flexible approach. That's not fair. The rule is in writing, and the only thing the Ninth Circuit has permitted is oral, on-the-record inquiry by the district court of the defendant. And basically, that becomes the same. The written transcript becomes the written waiver. But otherwise, the Ninth Circuit, nor to my knowledge any other circuit in the country, has said it's enough if the lawyer signs off and the defendant is never questioned. The defendant was not present. Thank you very much for giving me that time. Robertson, thank you. And you have saved some time. Yes, yes, but very briefly, I just want to, again, I'm trying to knock out that count, too, on McKittrick. I think the jury issue's been addressed. And again, I want to say Sands, it wasn't Laney, but Kerry Sands, he was the project manager that approved the 90,000. He was a government witness. I thought there was a change between Sands and then Laney came in towards the end of it. The opposite. OK, so there was a change. So Laney had a hand in it. He just didn't, he wasn't on watch when Sands completed it. That's one way to look at it, but I view it as, Laney actually was technically involved in the matter when the $45,000 for one tank went in. Did Laney's company bill submit an invoice for work done on that project to Imperial? Right, they did. They submitted it. So he got the money out of it. The 90,000. Yeah. So he got some money out of that. But again, the 90,000 was approved by Sands, not a criminal co-conspirator, and it was, and Federico turned down the $45,000 for one tank. It wasn't worth taking his equipment down there. He had to double that. It made the job worth it. So that bit, I know that he's got the pattern. I know that there's similarities and all. Well, I mean, the general rule in these cases, you know it as well as I do, is follow the money. Right. Right? I mean, that's what we all do. It's what the government tries to do when they approve the scheme to defraud, and what the defense tries to deflect the jury's attention from. But I mean, you know, at the end of the day, it was your client who was sitting there holding the kickback. The 70,000, and he split 7,000, and he got 63. I mean, everybody got well, because it was raining. I agree. But that is not, that's not kickback off that project. That project was not fraudulent. That is simply money that he defrauded. Only Ibarra owed him. Maybe he hated him. Maybe he owed him money. Whatever the motivation, it can't be tied. Well, Ibarra apparently lost a lot of money on this deal, and he was totally ignorant of the fact that this money was being funneled around him. I don't understand how they could have carried the scheme out for this long without him figuring out something was going on. That's what strikes you. But that's what also shows this was not a fixed bid on this one. Or that Ibarra may be one of the most ignorant businessmen in the history of business. Well, on this one, it's a possibility, because he kicks back, he gives back 70,000 dollars, leaves him with 20,000 dollars. The math doesn't make any sense. Well, unless he thought, well, geez, I already sold a bunch of money that I should have given to Federico that I owed him anyway, and, you know, no honor among thieves. No honor among thieves. I thought that that kickback 70,000 was a side deal, and it didn't really taint that sufficience. Roll that count out. Thank you. Okay. Thank both sides for their arguments. The case of United States v. Laney and United States v. Federico now submitted for decision. The last case this morning, Roberts v. AT&T Mobility.
judges: Hawkins, W. Fletcher, Tallman